The Plaintiffs here seek judicial review under the APA of the military's professional judgment regarding the conditions under which certain foreign nationals can access military facilities and information. But a long line of cases, starting at least with Reeves v. Ainsworth in 1911, established that courts should not interfere with sensitive military affairs or second-guess discretionary decisions based on military expertise. Indeed, the Supreme Court has instructed lower courts to be as scrupulous not to interfere with legitimate military matters as the military must be scrupulous not to interfere in judicial matters. So when we look at the factors in the Mendes doctrine, which directs us as to when this sort of issue is non-justiciable, the first factor is the nature and strength of the plaintiff's claim. And I'd appreciate it if you could walk through why their APA claim is weak. That's the government's position. And what is the material in the record from which the court could reasonably discern the DOD's pathway in coming out with that October 13th memo? Certainly. So I'll start with the strength and nature of the claim. This court in Calsa said very clearly that, as a general matter, a statutory claim gives less weight to review than a constitutional claim. So first, as a general matter, an APA claim, of course, is a statutory claim. And that's the claim that's before this court on the appeal of the preliminary injunction. Second, I think if we look at the nature of the claim, this arbitrary and capricious claim is a claim that the military hasn't sufficiently justified its policy. So if the plaintiffs were to prevail on that claim, it doesn't necessarily mean that the October policy was unlawful, just that the military would have to provide a better explanation. So we think this is a different kind of claim in nature from the type of, say, constitutional claim that would completely prohibit the military from taking a certain action. So then, I believe the second part of Your Honor's question had to do with the material in the record that supported the DOD's conclusion here. As Your Honor knows, it's sufficient if, assuming review is available under Mindy's and under the APA, it's sufficient if the it can be. The record contains a number of materials that are helpful in this regard. First, we have the National Security Adjudicative Guidelines, which establish that foreign contacts and interests and indicators of foreign allegiance may be sources of national security risks that need to be carefully investigated. Second, we have a determination from the Department of Defense that another program which permitted the, this is the MAVNI program, which permitted the accession of a different population of foreign nationals, that it presented the accession of foreign nationals over that program presented an unacceptable risk unless the recruits were first subjected to security screening. Third, we know that the Department of Defense was concerned about the screening procedures applied to LPRs. Fourth, we have the Secretary of Defense asking whether LPRs presented similar security risks to recruits in the MAVNI program. And a memorandum in the administrative record establishes DOD's conclusion that they did present similar risks and that from this point forward, policies affecting LPRs and MAVNIs would be put out in tandem. And then finally, in October of 2017, the Department of Defense applied to LPRs one of the same security screening policies that had already been applied to MAVNIs, the requirement that they receive their military suitability and national security determinations before accession or shipment to basic training. So I think that is the path that can be reasonably discerned from the administrative record. And the Smith Declaration further explains these in greater detail and therefore provides illumination of the reasons that were set out in the administrative record. But the district court said that it was inappropriate to look at it to determine whether the APA requirements were fulfilled because it was after the fact. Is that correct? So the declaration was created after the decision was made, but I think it's important to look at the context in which this arose. The plaintiffs filed a motion for preliminary injunction. At that time, there was no deadline for the filing of the administrative record. The government provided the declaration, which responded to the motion for preliminary injunction, outlined the harms that would cause to the government, which the district court recognized were appropriate to consider. It also explained the policy and how it arose. Although it was created after the decision, it is not the kind of post hoc rationalization that is improper. Rather, it's an explanation of the basis of the agency's decision in a situation where there was no deadline yet to file the administrative record. And several cases that we cited, indeed that the other side has cited, including Connick-Panana from this court, established that agency explanations are appropriate if they, these types of declarations are appropriate if they're explanatory of the basis of the agency's decision and don't provide the kind of new post hoc rationalizations providing basis that an agency could have relied on but did not, in fact, rely on. Well, one of the criticisms from opposing counsel is that this is pretty thin given the decades of policy allowing immediate accession or very rapid accession. What's your response to that? Well, I have a couple of responses. First, I don't think there's any need for an administrative record at all in this matter because for two reasons this case, this claim is not subject to judicial review. First, we have the Mindy's Doctrine that Your Honor mentioned and Judge Gould recognized precluded review here. We also have Section 701A2 of the Administrative Procedure Act which bars review of matters that are committed to agency discretion. And this type of discretionary policy based on military expertise where there's no statute or even regulation that prevents the agency or the DOD from acting in this manner, this is precisely the type of discretionary action based on military expertise and national security concerns that is committed to military discretion. And so there's no need for any type of administrative record here. And indeed, this isn't the kind of thing that we want the military to do. The military should be able to exercise its professional judgment regarding appropriate measures to take to mitigate national security risks without worrying that it has provided a sufficient narrative explanation that would satisfy any particular court before which the matter was brought. That causes me to believe that your position is that the military decisions are never subject to review. And of course, we know what Mendes says, that military expertise and discretion are essentially, they're covered under the test part four in particular, discouraging interference. But there must be some occasions on which a line can be drawn. And even yourself a moment ago in answering Judge Okuda's question, you said this is the kind of case where, but how do you explain that? Where would you describe where the line is drawn? When is the kind of case on the side where discretion is appropriate or on the other side where discretion is inappropriate? Certainly. So the Mendes test was adopted precisely for this reason because it was difficult to know where to draw that line. There was a long line, as I mentioned in my opening, Supreme Court cases establishing judicial reluctance to interfere in military matters. And Mendes was an attempt to provide a framework to guide that inquiry. So we look at the third and fourth factors in light of the policy considerations that counsel against interference. So the third factor looks at the extent to which a matter would interfere with essential military functions and interests. As Judge Gould recognized, the interference is at its zenith here where the military takes an action motivated by national security concerns. So this case is on a kind of far end of the spectrum in that regard because it's a military policy specifically addressing national security risks. The fourth factor looks at whether military discretion and expertise was involved. We know from a long line of cases, notably Egan in the Supreme Court, that the type of predictive judgment that is needed to make national security decisions is committed to agencies, in this case DOD, and courts have comparatively less expertise assessing such matters. This court in CULSA explained that when we're looking at the third and fourth factors, a court is not free to substitute its judgment for the military's assessment of how important an interest is and the extent of interference. If it's a matter that traditionally involves military experience, then it's judgment and expertise, and if the matter falls within that area and what the court said is if it does not involve allegations that are palpably untrue or highly questionable. So looking at this court's decision in CULSA and the policy reasons behind the Mindy's test, I think that while the line may be difficult to draw in some areas, in this case we are pretty safely in an area where courts should not review discretionary military decisions. The district court thought that the potential injury to the plaintiffs was high. What's your response to that? They referenced they're stuck in limbo and their career is impaired and they're unable to apply for expedited naturalization. So I have a couple of responses. First I think this is pretty directly answered by this court's decision in CULSA, which said that even the injury caused by a complete bar on enlistment would not be sufficient in these circumstances. Here we necessarily have a much lesser injury because there is no bar on service for any recruit who can satisfy the substantive standards for service. There's just a delay in entering the training program. And I think key to assessing the scope of this delay and whether it can really be thought of as a significant injury is looking at the applicable statute, the contracts that the recruit has to comply with and prior practice. Under the prior policy, only half of LPR recruits actually shipped out before their background investigations were complete. So there was no reasonable expectation that someone would ship out necessarily right away. Additionally, the contracts that they signed clearly stated that they were entering what's called the delayed entry program. They would be put in non-pay status, would not receive military benefits, and they could be held there for up to a year, and that could be extended by the relevant service. Statute provides that a recruit can be held in the DEP for up to two years before being discharged. So I think when you look at the contract, prior practice, and the statute, the plaintiffs were on notice that they would be in this position for possibly up to two years. So I don't think that this policy really inflicts any significant injury. It merely, it's an application of what was already possible and could be expected under the statute and the time frame. Well, let me indulge and just ask you this one question, given you so much time left. If we were to find, as you ask, that the injunction should not have been issued, what is it that you believe is the appropriate response? Are you asking that we find there was an abuse of discretion, or do you believe there is some error that underlies that prevailing point for you? I'm not sure. I believe that there were at least two, well, three legal errors committed by the district court to relate to whether this case was subject to judicial review at all. We have the application of the Mindy's Doctrine, and we have the Section 701A2 of the APA. Those are legal issues, so it wouldn't be a question of abuse of discretion. Also, the district court's assessment of the likelihood that the plaintiffs would prevail, this court could review as a legal matter. With respect to the balance of the equities, yes, I do believe there was an abuse of discretion there. I think given the risk to national security and to military personnel that could occur and that this policy was intended to mitigate, given that risk that would be created by allowing unvetted individuals with known foreign connections that need to be investigated to have access to military facilities and information, that's a very serious risk on the government side. Balance against the comparatively minor injury of delayed accession that the plaintiffs face, that the district court clearly misweighed the equities. So if this court were to... Well, I understand those three points. Let me ask this other question that I think you may even answer more briefly. Do you see a circumstance under which plaintiffs' claims could survive Mindy's but not 701A2? With respect to this claim, no, but there possibly could be other types of claims that could survive. Well, I'm not asking you to speculate. I'm speaking about the matter before us. No, I think both doctrines independently bar review and that... The reason I ask is that my reading of your writing is that 701 is a less complicated version of Mendez, and it sounds like that was just my reading. It wasn't your intention. Well, I think they are motivated by similar concerns. Section 701A2 was intended, as Justice Scalia has explained, to basically codify the common law of agency review. There were categories of agency decisions that were not subject to judicial review. Among those decisions that involved complicated balancing of discretionary factors within the agency's expertise. Another was decisions made in areas where courts have been historically reluctant to intrude. That includes the military and national security. So those same policies or policy considerations, especially the last one, informed Mindy's as well as Section 701A2. One important difference is that under the APA, there's no balancing. If you find that it's committed to agency discretion, then the inquiry is over. Counsel, could I interject a question? I apologize for using up your planned rebuttal time. But am I correct that if the court decided that the Mindy's doctrine is applicable, that in that circumstance, we would not need to reach the committed to agency discretion ground as an alternative? And in fact, if Mindy's applied, wouldn't it be correct to vacate the injunction and remand to the district court with instructions to dismiss the complaint? I think that's correct. So one way in which Mindy's sweeps more broadly than Section 701A2 is it can apply to constitutional claims. I think it's possibly correct that this court could decide Mindy's before Section 701A2. But I will note that some of this court's described Section 701A2 as jurisdictional. But I don't believe that it goes to the court's subject matter jurisdiction. So the court could choose its threshold ground either Mindy's or Section 701A2. And a decision on either ground would relieve the court of the obligation to answer the other one. And yes, I believe Your Honor is correct that if the court relied on Mindy's, it would vacate the injunction and instruct the court to dismiss whatever claim it found precluded by the Mindy's doctrine. All right. You're over time, but we'll give you a minute for rebuttal. Thank you very much. Good morning, Your Honors. Good morning, Judge Gould. Peter Wald of Latham and Watkins on behalf of the plaintiffs and the plaintiff class. Your Honors, you covered a lot of ground with my learned opponent, and I'm happy to take up those issues in response to questions from the panel. But let me try to begin by giving an overview that at least we think is relevant to this court's consideration. Judge Tiger issued a 55-page opinion that in our submission was extremely comprehensive and, frankly, very careful. This is the opposite of a wild-eyed opinion in which the district court judge sought to intrude upon prerogatives that have been given to the United States military. He carefully reviewed the administrative record, which is the key to this entire case and the key to the entire appeal, and he found no rational connection between the October 13, 2017 policy that was enacted and concerns that are raised for the first time in the Smith Declaration, not in the administrative record itself. Could you respond to opposing counsel went through several other things that were in the record prior to the October 13 memo? He mentioned the DNI guidelines, the MAVNI memos, and I guess there was a study in 2017 about difficulties in screening LPRs. Yes. Thank you, Your Honor. And these are covered in our brief, but let me go over them in more detail. Let me start, if I may, with the summary of the 2017 study, and let me be clear with the court that the government did not submit the study itself as part of the record. They submitted a summary, and that's all we have in the administrative record, not the study itself. Your Honors, the study concluded that the problem was that the government was not actually doing the things that it needed to do in reviewing the factual record in order to make the assessment that were covered by the background investigations. And the remedy that the policy imposes for that administrative failure by the government is to find on a class-wide basis that LPRs must wait the completion of their background investigations. On its face, the policy says that it's about process efficiency and information sharing. Period. Full stop. And what it then goes on to detail are the following problems. One, the DOD Consolidated Adjudication Facility did not review Tier 3 investigations and instead issued a no-determination made finding, thereby risking that derogatory information in an individual's file would not be acted upon. Two, the DOD Central Biometric Repository for Terrorist Data was not being systematically queried by the government as part of the fingerprint check. And three, DOD did not have access to LPR's green card or visa applications. These are procedural issues, and they're procedural problems, Your Honors, of the government's own making. And the remedy for them, as Judge Tiger correctly pointed out, is not to ban a whole class of potential recruits to the United States military, which had served with great honor and dignity for over 60 years on the same basis. Is it a ban or a delay? I thought it was a delay, but you used the word ban. Is it a ban? Fair point, Your Honor. It is a delay which has the effect in the year after it was passed. Of not allowing any of the LPRs to actually exceed. And as Judge Tiger found, the import of that was to have a serious detrimental effect on their careers, which is a kind of harm that this Court in the ADAC 2 case has recognized as being an irreparable injury. And it, of course, also delayed their path to citizenship, to naturalization, which in fact prevented them from moving forward with their military careers, because many of the positions that they're interested in can only be filled by U.S. citizens. It seems that you rely more on, well, you do rely on the APA claim as opposed to constitutional claims. And you heard your learned opponent mention this. It's stated in Mendes as well, that that weakens the claim. It makes it statutory as opposed to constitutional. Can you help us to understand your motivation or reasoning in doing that? Well, if I may, Judge Pearson, let me just say that we take issue with the claim that APA claims under 706 for arbitrary and capricious conduct are not, do not have a dignity that would support the preliminary injunction in this case under the nature and strength of the statute. But that's a little different than my question, because I'm sure you know in CALSA it's stated plainly that constitutional claims give more weight to an argument for reviewability. It did say normally, Your Honor, and we don't disagree with that. But what CALSA emphasized was the scale, and what Mendes emphasized, was the scale of values. Where on the scale of values does the issue that is under scrutiny fall? Whether the vehicle for the challenge is arbitrary and capricious conduct under the APA or equal protection and due process under the United States Constitution. The real issue is what is the right that is being compromised? And here the right that's being compromised is not the right to enlist, and it's not, respectfully, simply a delay in accession. It is the right not to be discriminated against as a class, but instead, to one of the questions Judge Aikuda asked, to have your individual accession decision made on the basis of individualized determinations. That's what the 1997 adjudicative guidelines say, Your Honor. It's an individual case-by-case analysis. Those guidelines have been in existence since the Clinton administration, since 1997. And LPRs have acceded into military service on the same basis as U.S. nationals throughout the period of time that those guidelines were in existence. So I understood from your statement about the material that's in the record explaining the DOD's decision that resulted in the October 13th memo that you disagreed with the DOD's analysis. But I'm not sure that's the issue. I think the question is whether there was enough so that we could understand the DOD's reasoning. Am I wrong about that? I guess I would articulate it this way, if I may, Your Honor. The attack is not a disagreement between us and the military. What Judge Tiger found, and what we wholeheartedly support, is that there's no rational connection between what's in the administrative record and the policy. The policy prevents LPRs from acceding into military service as a class. Until they've completed a review, right? Correct. And what's in the administrative record is that the reason the reviews weren't being completed was because the government had failed to move forward on the investigative checks in their background materials. They had identified a gap. So you're not disagreeing that the review was needed. You're just disagreeing on whether the government actually needed more time? Your Honor. Is that? I guess I'm not understanding your... And it's my fault. So if I may, I don't think I can say it better than Judge Tiger said it. And I'd just like to quote this part of his opinion. None of these findings rationally support the October 13 memos policy change because nothing in the administrative record suggests that these information sharing defects were caused by permitting LPRs to ship to basic training prior to the completion of background checks. Does that make sense? I mean, the question is not who caused the information gap. The question is what can the government do to fix the information gaps? And if it takes them time to fix the information gaps, we may regret the expenditure. But I'm not sure why that's not rational. Because, Your Honor, what he's saying is that because shipping LPRs to basic training didn't cause the information gap. What difference is that? I guess I don't understand what difference that makes. What's the cause? Your Honor, in our submission, the solution here, rather than imposing this restriction on an entire class of people, the solution here is to fix whatever the information sharing problems were that were discovered. And there's no indication in the administrative record that the government considered that, which of course would be a less restrictive alternative and not have these impacts on LPRs, which in turn has an impact, obviously, on the ability of the military to meet its recruiting goals, which is in the record and which Secretary Curta himself has acknowledged. So you've got — So you do disagree with their approach? I mean, that's what I was trying to understand. Is there not enough in the record or do you just disagree with their approach? I think what is in the record, Your Honor, doesn't support the policy. In other words, there's no rational connection between the problem that they've identified and the remedy that they have imposed. So you would say that having more time to do this review is not rationally connected with getting the review done and fixing the information gaps? Respectfully, Your Honor, there's nothing in the administrative record that indicates that the government is now going to even address or fix these issues, these problems that they themselves have identified. If there was, if there was something in the record that says, you know what, we can't fix these problems, and the only solution that's going to work here given our concerns about national security, which I would say are not outlined in the administrative record, they're barely mentioned in the Smith Declaration. But even putting that issue aside, if there was something in the record that said the only way to solve this, we've looked at the problem, we've looked at the possible solutions, and the only way to solve this is to impose this indefinite delay on all LPRs, regardless of whether they're individually qualified or present security risks, that would at least be something in the record that would be rationally connected. And what Judge Tiger said, again, it's the opposite of a wild-eyed, radical opinion. What he said is, it's this policy that I'm enjoining. If you believe that there is a policy that you can pass with an administrative record that analyzes these issues and comes to a reasoned judgment about why the remedy that you are asking to impose or that you are imposing, why that remedy is necessary to fix the problem, that's a different lawsuit. All I can do is deal with the policy that is in front of me and the 162-page administrative record which contains no rational basis for saying that this remedy is necessary or appropriate. If I may, let me talk about the MAVNI situation, Your Honor. It's a single sentence in the administrative record. All it says is that LPRs, quote, share many of the same risk factors with the MAVNI population. As Judge Tiger identified, first of all, there's no reason to believe that that wasn't true. If it's true, there's no reason to believe that it wasn't true in the decades that preceded the issuance of the policy. Second of all, this represents a significant change in the agency's practice. And as this Court has held in the ASSE case and in the Village of Kake case, changes in practice and changes in position need to be explained in order to fashion a rational connection. That's part of it. Hurt me ask, Mr. Pullum, about the line and where it should be drawn. I'd like you to address that question. It seems to me that this is the sort of sensitive internal military decision that Mendes protects, precludes us from judicial review on, and also that national security screening decisions are typically of the sort committed to agency decision. In fact, the more I listen to your fine articulation, I think you describe lots of reasons, and not knowing all, because only some summaries have been given in some cases, like the 2017 study. But if you could articulate why you believe this is on the side that does allow for judicial review, it might be helpful. Happy to, Judge Pearson. Our position, I think, is straightforward. We agree that the military needs to have discretion to make individual judgments under the adjudicative guidelines and under their own guidelines about whether individuals are fit for military service. And we believe the Court should give deference to those judgments, and there are many decisions of this Court which talk about that, and CALSA is one of them. The issue in CALSA, which had just been decided by the Supreme Court, by the way, had to do with haircut regulations. And there, there was a finding that there was an overwhelming military interest in assuring uniform appearance standards. That's a different kind of issue than saying that all aliens as a class are now going to be subject to this indefinite delay in acceding into military service with all of its consequences for their careers. So what we would say is the line should be drawn when you're talking about class-based discrimination, put aside whether it's heightened scrutiny or just rational basis, that the matter of judicial deference, the courts cannot abdicate their responsibilities to consider under the APA and under the Constitution whether that class-based discrimination is justified. We're not saying that it can never be justified under a rational basis standard. We're saying that it isn't justified on this administrative record and this policy, because there is nothing in the administrative record that supports the view that LPRs as a class have or pose national security risks that are different in degree and in kind to U.S. nationals with whom they have been acceding on a parallel and equivalent basis for decades. And this is a major radical change by the Department of Defense, and there is no attempt in the administrative record to explain why it was necessary. The only thing we see are two things. One, statements that the Department of Defense itself has failed to complete investigations and to rule upon them, to rule upon the individual files. So you wouldn't have, you wouldn't be here if it were all of the applicants that have not had their backgrounds completed to a certain extent, but because it identifies specifically LPRs, that's brought you to court? That's correct, Judge Pearson. For example, if this policy were broadly applicable to a set of accession regulations that they had been subjected to previously, I think it's quite possible that that would present a very different case. I would reserve judgment until I had an opportunity to review the administrative record and understand why there had been this policy change. But on its face, it wouldn't present a case of discrimination on a class-wide basis in the way that this policy does. And that's really all that Judge Tiger was saying. He wasn't saying you can never do this. He was saying this policy is not justified by this administrative record. It's a very, very narrow question. And this Court, and I guess here I do part company with my learned opponent, this Court has on many occasions reviewed military decisions. And it always comes down to the nature of the claim. And the nature of the claim that's being asserted here is a class-wide cleaver, if you will, a class-wide line drawing, which says LPRs as a group are going to be sacrificed to the government's inability or failure to review what's in these investigative files, even though that classification is both over-inclusive and under-inclusive. And it's over-inclusive because it includes many LPRs who were born in the United States and have lived here their entire lives and are not, therefore, subject to the kind of foreign influences that the government's ---- Everyone has the Internet. I'd move on to your next point, because we're all subject if we just look at our computers or cell phones. Exactly right, Your Honor. And the same is true of U.S. nationals who are born abroad or live abroad and work abroad. So the classifications that the government has imposed here are not rational. They're both over-inclusive and they're under-inclusive. And they're not saved by a single sentence, which is conclusory and not analytical and not based on data, that LPRs as a group share many of the same characteristics with the MAVNIs. They don't say what those characteristics are. And the Smith Declaration itself, if it were to be considered, in paragraph 12, says, in fact, that the risks with LPRs are not the same. They're lesser than they are with the MAVNIs. I think I'm out of time, Your Honors. All right. I think we have your argument. Thank you. Thank you. Thank you, Judge Gould. And we'll give you a minute for rebuttal. Thank you. I'll just make a few quick points. Opposing counsel a few times talked about, he mentioned that this was not the least restrictive alternative and this policy was not required by the only thing that could be done to address a flaw in the study. That's not required by the APA. As the Court well knows, it just has to be a reasonable action that's plausible. It doesn't have to be the only one available. And for that reason, it doesn't have to be a perfect fit. There can be some over-inclusiveness and under-inclusiveness as long as it is a response to Judge Pearson's question that the line between reviewable claims and non-reviewable claims was whether it affects a class of people. I think in CULSA there was a regulation that affected all Sikhs who couldn't comply with the appearance regulations. In West and Lindenau, which this Court in CULSA relied on, those were regulations that specifically affected a particular group of people, unwed parents with dependent children. Those are the only people that regulation applied to. And both courts declined review. And this Court cited those cases with approval. And I see my time is up and I will leave it there. Thank you very much. We thank both sides for their argument. In the case of Jihao Kuang and Aaron Cook versus Department of Defense, and James Mattis is submitted.
judges: Gould, Ikuta, Pearson